UNITED STATES of America,
Plaintiff,

v.

Elton CARTER, Defendant.

No. 03–CR–220.

United States District Court,
E.D. Wisconsin.

April 12, 2004.

Carol Kraft, Karine Moreno–Taxman, Milwaukee, WI, for Plaintiff.

Mark D. Richards, Racine, WI, for Defendant.

## *MEMORANDUM*

ADELMAN, District Judge.

The issue presented in this case was whether I should authorize the disclosure and use at trial as impeachment material a statement made by a cooperating co-defendant to a psychologist during a competency evaluation. I concluded that the statement should be disclosed under *Giglio* and that it could be used to impeach the credibility of the witness at trial. In this memorandum I set forth more fully the basis for my decision.

### I. BACKGROUND

The government charged Elton Carter, Eric Walker and Nicholas Alston with the armed robbery of a Milwaukee post office. Walker and Alston pleaded guilty and agreed to testify against Carter. Prior to trial, Carter moved for an in camera review of Alston's mental health records, specifically the report completed by a psychologist appointed by the court after Alston's lawyer filed a motion to determine his competency. Carter argued that the report might contain exculpatory or impeachment material, *see Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), and thus requested that the court review it and disclose all such material. The government agreed that the court could review the report in camera but asked to be heard prior to any disclosure.

I reviewed the report and concluded that it contained one statement which constituted impeachment material.[1] How-

---

1. The psychologist reported that Alston's "current position is that he did not participate in the robbery, even as an unwitting driver." The psychologist also reported Al-ston as being "distressed over the prospect of admitting guilt to something he said he did not do." This statement was inconsistent with prior and subsequent statements Alston

ever, the government opposed disclosure (and admission) of the statement, arguing that it was hearsay, was cumulative of other prior inconsistent statements Alston made, and should not be disclosed under Fed.R.Crim.P. 12.2. I rejected those arguments, ordered disclosure of the statement, and allowed its use at trial. However, given the context in which the statement was made, in order to avoid any unfair prejudice to the government the parties and I agreed to the precise language of the questions that Alston could be asked.

## II. APPLICABLE LEGAL STANDARDS

### A. Disclosure of Impeachment Material

■ The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Clause provides the defendant with two types of protection: (1) the right to physically face those who testify against him and (2) the right to cross-examine those witnesses. *Ritchie,* 480 U.S. at 51, 107 S.Ct. 989 (citing *Delaware v. Fensterer,* 474 U.S. 15, 18–19, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)).

■ The Supreme Court has held that "the right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Id.* at 51–52, 107 S.Ct. 989 (citing *United States v. Abel,* 469 U.S. 45, 50, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). This does not mean that the Sixth Amendment compels discovery of all material that might aid in cross-examination. *See id.* at 52–54, 105 S.Ct. 465. However, the Due Process Clause does afford defendants a right to disclosure of information in the possession of the government that is favorable to the accused and material to guilt or punishment. *Id.* at 57, 105 S.Ct. 465 (citing *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). This includes the right to disclosure of information concerning the credibility of key government witnesses. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bastanipour,* 41 F.3d 1178, 1181 (7th Cir. 1994). Thus, the Court in *Ritchie* held that although the defendant had no Sixth Amendment right to access the mental health records of the alleged victim of his crime, he was entitled to in camera review to determine whether they contained information useful to the defense under *Brady/Giglio.* 480 U.S. at 57–58, 107 S.Ct. 989. This was so even though state law generally shielded such records from disclosure. *Id.* at 57–58, 107 S.Ct. 989.

### B. Appropriate Standard Prior to Trial

■ The *Ritchie* Court adopted the *Brady* standard for disclosure of material in mental health records. Under *Brady* and *Giglio,* the defendant's due process rights are violated if the government fails to disclose evidence that is "favorable" to the defense and "material" to an issue in the trial. *See, e.g., United States v. Hartbarger,* 148 F.3d 777, 786 (7th Cir.1998), *overruled in part on other grounds by*

made. Alston first spoke to the police about the robbery on or about January 18, 2003, implicating Walker but denying any personal involvement. He again denied involvement when interviewed on or about September 10, 2003. Three days later he admitted that he was the driver during the robbery and inculpated Carter and Walker. But during the competency interview on December 3, 2003, he made the above-statements. Alston pleaded guilty on February 6, 2004, a few days before the trial was scheduled to begin.

*United States v. Colvin,* 353 F.3d 569, 576 (7th Cir.2003) (en banc); *United States v. Earnest,* 129 F.3d 906, 910–11 (7th Cir. 1997); *United States v. Gonzalez,* 93 F.3d 311, 315–16 (7th Cir.1996). Evidence is "favorable" if it "is either exculpatory in nature or tends to impeach a prosecution witness." *United States v. Reyes,* 270 F.3d 1158, 1167 (7th Cir.2001). Evidence is "material" if there is a reasonable probability that disclosure would have changed the result of the trial. *United States v. Williams,* 272 F.3d 845, 864 (7th Cir.2001).

This standard was developed in the context of appellate consideration of the effect of non-disclosure. *United States v. Sudikoff,* 36 F.Supp.2d 1196, 1198 (C.D.Cal. 1999). Specifically, the materiality prong presumes that the trial has already occurred and requires the court to determine whether the result could have been different had the evidence been disclosed. But a court deciding whether material should be disclosed prior to trial does not have the luxury of reviewing the trial record.

Recognizing this, in *Sudikoff,* the court concluded:

> This standard is only appropriate, and thus applicable, in the context of appellate review. Whether disclosure would have influenced the outcome of a trial can only be determined after the trial is completed and the total effect of all the inculpatory evidence can be weighed against the presumed effect of the undisclosed *Brady* material. *See, e.g., Giglio,* 405 U.S. at 154, 92 S.Ct. 763 (finding violation because "the Government's case depended almost entirely" on the cooperating witness's testimony, making impeachment crucial); *Carriger v. Stewart,* 132 F.3d 463, 480 (9th Cir.1997) (finding violation because lack of corroborating evidence at trial made impeachment evidence material); *Willhoite v. Vasquez,* 921 F.2d 247, 249 (9th Cir. 1990) (finding no violation because there

was "sufficient evidence apart from" the withheld evidence); *see also United States v. Valenzuela–Bernal,* 458 U.S. 858, 874, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (noting that "because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer" such determinations "until after the presentation of evidence"). This analysis obviously cannot be applied by a trial court facing a pretrial discovery request.

Additionally, the post-trial review determines only whether the improper suppression of evidence violated the defendant's due process rights. However, that the suppression may not have been sufficient to violate due process does not mean that it was proper. This conclusion is clear from consideration of an analogous standard of review, the standard for ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In *Strickland,* the Supreme Court set the standard for ineffective assistance of counsel as assistance that falls below reasonably objective standards and that prejudiced the defendant. As its standard for prejudice, the Supreme Court drew from *Brady*'s materiality standard. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 ("Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution ...."); *United States v. Spawr Optical Research, Inc.,* 864 F.2d 1467, 1472 n. 6 (9th Cir.1988) ("The *Strickland* standard for prejudice has been considered to impose virtually the same burden on the defense as the standard for materiality in *Brady* claims."). Thus, the tests for *Strickland* and *Brady* are similar.

In this light, it is clear that *Brady*'s materiality standard determines preju-

dice from admittedly improper conduct. It should not be considered as approving all conduct that does not fail its test. Just as unreasonably deficient assistance of counsel is improper even if it does not meet the prejudice prong of *Strickland* and result in a Sixth Amendment violation, so suppression of exculpatory evidence is improper even if it does not satisfy the materiality standard of *Brady* and result in a due process violation. Though an error may be harmless, it is still error.

Therefore, post-trial standards and cases applying them are not helpful for determining the government's disclosure obligations.

*Id.* at 1198–99.

The *Sudikoff* court then concluded that, prior to trial, the standard should simply be whether the evidence is favorable to the accused, i.e. whether it relates to guilt or punishment and tends to bolster the defendant's case or impeach prosecution witnesses. *Id.* at 1199. The materiality component should be dropped.

> [I]n the pretrial context it would be inappropriate to suppress evidence because it seems insufficient to alter a jury's verdict. Further, "the government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure . . . ."

*United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir.1984) (citing *United States v. Goldberg*, 582 F.2d 483, 489 (9th Cir.1978)). Thus, the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case.

*Id.; see also United States v. Peitz*, No. 01–CR–852, 2002 WL 226865, at *3, 2002 U.S. Dist. LEXIS 2338, at *7–8 (N.D.Ill. Feb. 13, 2002) (following *Sudikoff* and holding: "In the pretrial context, the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, with doubt as to usefulness resolved in favor of disclosure.") (internal quote marks omitted).[2]

■ I agree with the *Sudikoff* and *Peitz* courts that, in the pre-trial context, the court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its "materiality" at trial. The judge cannot know what possible effect certain evidence will have on a trial not yet held. In most cases, the judge will have only a vague approximation of what the proof will be; thus, he cannot meaningfully evaluate how the addition of other evidence would alter the trial. Therefore, the court should ordinarily require the pre-trial disclosure of all exculpatory or impeachment evidence. *See Peitz*, 2002 WL 226865, at *3, 2002 U.S. Dist. LEXIS 2338, at *8.

## III. APPLICATION OF STANDARD TO ALSTON'S STATEMENT

■■ Alston's statement was discoverable under *Brady, Giglio* and *Ritchie.* It is well-settled that impeachment material, including prior inconsistent statements, falls within the rule of *Brady* and *Giglio. E.g., Strickler v. Greene*, 527 U.S. 263, 282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)

**2.** In *United States v. McVeigh*, 954 F.Supp. 1441, 1449–50 (D.Colo.1997), the court noted: "There is no established procedure for the due process disclosures required by *Brady.* The information should be given to the defense as it becomes known to the government, since the information and material must be available to the defense in sufficient time to

make fair use of it. Generally, *Brady* violations first come before a court after the trial and the court may then consider the materiality of what was suppressed or omitted from disclosures made, in the context of the complete trial record. Indeed, it is not possible to apply the materiality standard in *Kyles* before the outcome of the trial is known."

("*Brady 's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness."); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("Impeachment evidence, . . . as well as exculpatory evidence, falls within the Brady rule."); *Spicer v. Roxbury Correctional Inst.,* 194 F.3d 547, 556 (4th Cir. 1999) (holding that government witness's prior inconsistent statement clearly satisfied the first requirement of a *Brady* violation—that the evidence be "favorable" to the defendant). Because the statement Alston made to the psychologist was inconsistent with other statements he made both before and after the competency evaluation, it was useful to the defense in impeaching his credibility.

Under the circumstances of the present case, the statement was particularly useful. First, the testimony of the co-defendants was a major component of the government's case against Carter; no physical evidence nor any eye witnesses linked Carter to the crime. Therefore, impeaching the credibility of the cooperating co-defendants was crucial to Carter's defense.

Second, even though Alston had made other prior inconsistent statements, the timing of this statement was important. As noted, Alston first spoke to the police in January 2003. At that time, he claimed that Walker committed the robbery and denied that he was involved. He again denied involvement on September 10. However, on September 13, Alston stated that he, Walker and Carter committed the

crime, and that he was the driver. Alston, Walker and Carter were indicted on October 15, 2003. Alston's lawyer moved for an evaluation of his competency, and the magistrate judge ordered a psychological examination. On or about December 3, 2003, Alston met with Kenneth Smail, Ph. D., who interviewed Alston and concluded that he was competent. Most of the report Dr. Smail generated was irrelevant to Carter's defense. However, Alston's "current position" "that he did not participate in the robbery, even as an unwitting driver," and the fact that "he was distressed over the prospect of admitting guilt to something he said he did not do," was important impeachment material. This was Alston's only statement denying involvement in the crime after he initially confessed on September 13. His previous denials could be explained as reluctance to confess and inculpate himself; however, his denial of any involvement *after* he had confessed and inculpated the others (which confession closely preceded the indictment) could reasonably be seen as more significantly undermining his credibility.[3]

## IV. ARGUMENTS AGAINST DISCLOSURE

### A. Government's Arguments

The government opposed disclosure principally for three reasons. None were persuasive.

■ First, the government argued that any statements made to Dr. Smail were hearsay.[4] However, a testifying declarant

---

3. Thus, even if it were proper to consider materiality before trial, this statement would satisfy that standard.

4. The government also claimed that, because the statement appeared in a report written by Dr. Smail (and may have been paraphrased), it was not really Alston's statement. However, there is no requirement that a prior inconsistent statement be a verbatim recording. In the related context of statements covered by

the Jencks Act, courts have long held that interview notes which contain substantially accurate recitals of witness statements must be disclosed. *United States v. Neal,* 36 F.3d 1190, 1198 (1st Cir.1994) (collecting cases). There was no claim in the present case that Dr. Smail mis-characterized what Alston said.

may be impeached by his prior inconsistent statements without offending the rule against hearsay. Fed.R.Evid. 613; *see, e.g., United States v. Buffalo*, 358 F.3d 519, 522 (8th Cir.2004) (holding that, while a witness's prior statement could be excluded if introduced to prove the truth of the matter asserted, it should have been admitted to impeach the witness's testimony as a prior inconsistent statement); *Norton v. Spencer*, 351 F.3d 1, 9 n. 3 (1st Cir.2003) (noting, in the context of a *Brady* claim, the prior inconsistent statement exception to the hearsay rule).[5] Alston's statement was admitted for purposes of impeachment only.

■■■ Second, the government argued that any statements Alston made to Smail would be cumulative of the other prior inconsistent statements Alston made. Cumulative evidence may properly be excluded, even if it constitutes impeachment material under *Brady*. *See Norton*, 351 F.3d at 7 (collecting cases); *United States v. Dweck*, 913 F.2d 365, 371 (7th Cir.1990) (collecting cases).[6] However, the statement in question was not merely cumulative. As noted, it was the only statement Alston made, after initially confessing and being indicted, in which he denied involvement in the offense. Thus, it was different from his pre-confession denials.

■■■ Finally, the government argued that the statement could not be used against Alston pursuant to Fed.R.Crim.P.

12.2. That rule governs mental examinations of criminal defendants. Sub-section (c)(4) provides:

No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:

(A) has introduced evidence of incompetency. or evidence requiring notice under Rule 12.2(a) or (b)(1), or

(B) has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

Fed.R.Crim.P. 12.2(c)(4).

Rule 12.2(c)(4) was inapplicable under the circumstances of the present case. The Rule was designed to safeguard the defendant's Fifth Amendment right against self-incrimination during mental health examinations, allowing him to freely converse with the evaluating psychiatrist without running the risk that his statements would be used against him at his trial. *See* Fed. R. Crim P. 12.2(c) advisory committee's note. Alston's statement to Dr. Smail was not introduced against *him* at *his* trial; rather, it was used to impeach his credibility at the trial of another.

---

**5.** Under Fed.R.Evid. 801(d)(1)(A), a declarant's prior inconsistent statements are hearsay and inadmissible as substantive evidence unless they were made "under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or at a deposition." The statement at issue in the present case was not made under oath; thus it was not admissible as substantive evidence to prove the truth of the matter asserted. Nevertheless, the statement was admissible as impeachment evidence under Fed.R.Evid. 613. *See United States v. Navedo–Concepcion,* 73 Fed.Appx.

451, 453–54, 2003 WL 22006310 (1st Cir. 2003); *see also Santos v. Murdock,* 243 F.3d 681, 684 (2d Cir.2001) ("Prior inconsistent statements are generally admissible for impeachment purposes only, *see* Fed.R.Evid. 613, and are inadmissible hearsay for substantive purposes unless they were made at 'a trial, hearing, or other proceeding, or in a deposition.' Fed.R.Evid. 801(d)(1)(A).").

**6.** Of course, these cases involved post-trial review of the record.

Thus, the Rule did not bar disclosure and admission of the statement.[7]

## B. Alston's Privacy Interests

 Although Fed. R. Crim P. 12.2 did not apply, I recognized that there were legitimate concerns with disclosing any portion of a report containing sensitive personal information. "Under *Ritchie*, where psychiatric, investigative or medical information is privileged or confidential, it is to be turned over to the trial court for in camera review to balance the needs of the defendant and the state or individual's need to keep those records private." *United States v. Hach*, 162 F.3d 937, 947 (7th Cir.1998) (citing *Ritchie*, 480 U.S. at 61, 107 S.Ct. 989). Here, Alston surely had a legitimate interest in keeping this report confidential. However, that interest was outweighed by Carter's interest in a full and fair trial, with a complete opportunity, for effective cross-examination of the key witnesses against him.

First, I did not order disclosure of the entire report, just one statement within it. That statement did not concern any private information, as is often disclosed during such examinations; rather, it concerned Alston's role in the offense. Thus, in weighing the competing interests, Alston's side of the scale was relatively light.[8]

Second, Carter's interest in impeaching Alston was strong. As noted, there was no physical evidence and no eye witnesses.

The government relied almost entirely on cooperating witnesses. Carter's ability to impeach those witnesses was crucial to his defense. *See Crivens v. Roth*, 172 F.3d 991, 998 (7th Cir.1999) ("When the credibility of a witness plays a pivotal role in a conviction, it may become an issue upon which we will reverse a conviction [based on failure to disclose evidence under] *Giglio* [.]"); *United States v. Tracey*, 675 F.2d 433, 438 (1st Cir.1982) ("Especially where the witness is an accomplice of the defendant or may have some other substantial reason to cooperate with the government, the defendant should be permitted wide latitude in the search for the witness' bias."); *see also Bagley*, 473 U.S. at 676, 105 S.Ct. 3375 (recognizing that, if disclosed and used effectively, impeachment evidence may make the difference between conviction and acquittal); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

Although there appear to be relatively few cases discussing disclosure of the competency reports of testifying co-actors under *Brady* and its progeny, courts have under similar circumstances struck the same balance I did and held that disclosure was required. For example, in

---

7. There is, of course, a difference between disclosing a statement prior to trial and admitting it at trial. Rule 12.2 speaks only of admission, not disclosure. Nevertheless, in the circumstances of the present case, where the statement was to be used for the limited purpose of impeaching Alston's credibility, the two essentially merged.

8. In order to avoid undue prejudice to the government and unnecessary embarrassment to Alston, the parties and the court agreed, outside the presence of the jury, on the precise questions that would be asked of Alston. He was asked whether, when· he met with "Mr. Smail" pursuant to a court order, he had made the statements discussed above. No reference was made to the fact that this statement was made to a psychologist or that Alston's competency was evaluated on court order. At Carter's trial, Alston admitted making the statement, and there was thus no need to consider whether extraneous evidence of the statement should be admitted.

*Chavis v. North Carolina,* 637 F.2d 213, 224 (4th Cir.1980), the court found a *Brady* violation where the government suppressed the competency report of a cooperating co-actor, which indicated that during the evaluation he had denied involvement in the offense, in direct contravention of his trial testimony. The court expressed no doubt that this report "would surely shake his credibility." *Id.* Further, the court mandated disclosure even though under applicable law such reports were not public records. *Id.* at 225. The competency report in the present case contained identical impeachment material, which was properly disclosed.

In *State v. Hunt,* 64 N.C.App. 81, 306 S.E.2d 846, 850–51 (1983), the court ruled that the state was required to turn over the competency report of a cooperating witness, Forney. The court stated:

> No physical evidence connected defendant with the crime and Forney was the main witness against him; but, according to the record, for two weeks after the crime, Forney truthfully maintained to the officers that he knew nothing whatever about the crime and was not involved in it. After undergoing hypnosis at the suggestion of the police, however, Forney professed to recall the crime and that defendant participated with him and several others in it; and shortly thereafter, he underwent a court-ordered psychiatric evaluation, negotiated a plea, and a light sentence was recommended for him. Obviously, information bearing upon Forney's mental and emotional stability, why hypnosis was needed to reactivate his memory, how he came to agree to it, and the circumstances that led to the plea bargain was essential to defendant's case

and should have been made available to him upon request.

*Id.* at 850. In the present case, Alston also denied involvement in the offense during his initial encounters with the police, then, after inculpating himself and others, negotiated a plea.

The defendant in *Hunt* had requested Forney's competency report in a pre-trial motion. However,

> The [trial] court apparently withheld the psychiatric evaluation report under the mistaken impression that it was required to do so by statute. Though the examination was made for the purpose of establishing Forney's capacity to plead to the indictment against him pursuant to the provisions of G.S. 15A–1002, and that statute does require the hospital to give copies of its report only to the court and the examinee, it expressly authorizes the court to handle its copy as it sees fit and to reveal its contents to others under such conditions as are deemed appropriate. But even if the statute required that Forney's privacy be kept inviolate, since he had negotiated a plea and his fair trial rights were no longer involved, it would have to yield to the superior constitutional rights that are here involved. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

*Id.* The same principle was applicable in the present case: even if Alston had legitimate privacy interests in the report, those interests had to give way to Carter's superior right to a fair trial.[9]

The Seventh Circuit appears not to have discussed the disclosure of competency re-

---

**9.** *See also Wiman v. Powell,* 293 F.2d 605 (5th Cir.1961) (granting habeas relief where prisoner was convicted based primarily of the testimony of an alleged accomplice, and pros-

ecution failed to disclose psychiatrist's report tending to show the insanity of the accomplice, who had entered NGI plea).

ports. However, in the analogous context of Pre-sentence Investigation Reports (PSRs), the Seventh Circuit has held that in camera review and disclosure may be appropriate, notwithstanding the presumptive confidentiality of such reports. *See* Crim. L.R. 32.2 (E.D.Wis.2001); *cf. United States v. Kelly,* 314 F.3d 908, 913 (7th Cir.), *cert. denied,* 538 U.S. 1001, 123 S.Ct. 1923, 155 L.Ed.2d 829 (2003).[10]

"Generally, presentence reports are helpful in effectively cross-examining witnesses because these reports may contain impeachment material. They may also contain exculpatory material culled from investigations and dealings with co-conspirators." *United States v. Canino,* 949 F.2d 928, 942 (7th Cir.1991) (citing *United States v. Anderson,* 724 F.2d 596, 598 (7th Cir.1984)). Nevertheless, there is no "absolute requirement that district judges examine witnesses' presentence reports." *United States v. Mitchell,* 178 F.3d 904, 908 (7th Cir.1999).

> While both *Anderson* and *Canino* authorize in camera review, and even suggest that in camera review is good practice, neither case contradicts our earlier statement that "a *Brady* request does not entitle a criminal defendant to embark upon an unwarranted fishing expedition through government files, nor does it mandate that a trial judge conduct an in camera inspection of the government's files in every case." *United States v. Phillips,* 854 F.2d 273, 278 (7th Cir.1988). While the proper procedure for a defendant is to request an in camera inspection if the defendant suspects that *Brady* material has not been disclosed, the defendant is not entitled to have his request granted absent some

indication that the report contains impeachment material of the kind requested.

*Id.* at 908–09.

The same procedure was followed in the present case: the report was reviewed in camera and a prior inconsistent statement was discovered. Because the statement constituted impeachment material under *Giglio,* disclosure of a portion of the competency report was proper, despite its confidentiality.

## V. CONCLUSION

After a three day trial, the jury acquitted Carter.

---

10. "The criminal defendant has a strong interest in maintaining the confidentiality of his or her presentence report. Sentencing proceedings, and particularly the presentence investigation, often involve a broad-ranging inquiry into a defendant's private life, not limited by traditional rules of evidence." *United States v. Corbitt,* 879 F.2d 224, 230 (7th Cir.1989). The same can be said of competency evaluations and reports.