UNITED STATES of America,
Plaintiff,

v.

Richard A. CAUSEY, Jeffery K.
Skilling, and Kenneth L.
Lay, Defendants.

No. CRIM.H–04–025.

United States District Court,
S.D. Texas,
Houston Division.

Feb. 2, 2005.

See, also, 2004 WL 2414438.

**682**

Richard A Causey, The Woodlands, Pro Se, Barry S Berger, Attorney at Law, Houston, TX, Mark J Hulkower, Attorney at Law, Reid H Weingarten, Steptoe Johnson LLP, Washington, DC, for Richard A Causey (1) $1,000,000 PR Appearance Bond w/ a $500,000 cash deposit by deft Causey, bro-in-law as surety signature, Defendant.

Jeffrey K Skilling, Houston, TX, Pro Se, Bruce Hiler, O Melveny Myers LLP, Washington, DC, Daniel M Petrocelli, O Melveny and Myers LLP, Los Angeles, CA, Jeffrey W Kilduff, O Melveny and Myers LLP, Washington, DC, M Randall Oppenheimer, O Melveny and Myers LLP, Mark Holscher, O Melveny and Myers LLP, Los Angeles, CA, Robert M Stern, O Melveny Myers LLP, Washington, DC, for Jeffrey K Skilling (2) $5,000,000 appearance secured bond executed on 2/19/04, deft deposited cashier's check, Defendant.

Chip B Lewis, Attorney at Law, Michael Wayne Ramsey, Attorney at Law, Financial Litigation, U S Attorney's Office, Southern District of Texas, U.S. Marshal—H, U.S. Pretrial Svcs—H, U.S. Probation—H, Houston, TX, Kathryn H Ruemmler, U.S. Dept of Justice Crim Div, Enron Task Force, Linda Lacewell, AUSA, Washington, DC, Samuel W Buell, U.S. Atty's Off, Boston, MA, for Kenneth L Lay (3) Unsecured $500,000 c/s PR bond, Defendant.

## MEMORANDUM AND ORDER

LAKE, District Judge.

Pending before the court are Jeffrey Skilling's Motion for the Identification and Production of *Brady* [1] and Rule 16 Materials (Docket Entry No. 164), Jeffrey Skilling's Motion for the Identification and Production of *Brady*, Rule 16, and Jencks Act Materials in the Possession of Cooperating State and Federal Agencies, the Enron Bankruptcy Examiners, and Other Cooperating Investigators (Docket Entry No. 176), Defendant Richard A. Causey's Motion for the Identification and Production of *Brady* Materials (Docket Entry No. 181), and Kenneth L. Lay's Motion for the Production of Material Favorable to the Accused (Docket Entry No. 237). For the following reasons the motions will be denied.

### I. Introduction

The defendants in this action are charged in a 53–count Second Superseding Indictment (SSI) (Docket Entry No. 97)—either jointly or individually—with conspiracy, securities fraud, wire fraud, bank fraud, insider trading, money laundering, and making false statements to banks. The offenses charged in the SSI arise from an alleged scheme to deceive the investing public, including Enron's shareholders, the Securities Exchange Commission (SEC), and others

---

1. *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

about the true performance of Enron's businesses by: (a) manipulating Enron's publicly reported financial results; and (b) making public statements and representations about Enron's financial performance and results that were false and misleading in that they did not fairly and accurately reflect Enron's actual financial condition and performance, and they omitted to disclose facts necessary to make those statements and representations fair and accurate.

(SSI ¶ 5)

## A. Defendants

The SSI alleges that the defendants served in various executive positions at Enron, i.e., that Lay served as Chief Executive Officer (CEO) and Chairman of the Board of Directors from Enron's formation in 1986 until February of 2001 when he stepped down as CEO and continued as Chairman; that Skilling served as President and Chief Operating Officer (COO) from January of 1997 until February of 2001, and served as President and CEO from February of 2001 until August of 2001 when he resigned; and that Causey served in various positions from 1992 until 1998 when he became Enron's Chief Accounting Officer (CAO). (SSI ¶¶ 6–8)

## B. Factual Basis for the Charges Alleged in the SSI

The SSI enumerates eight "Devices Employed in Furtherance of the Scheme" involving multiple transactions or manipulations, including *inter alia,* (1) using a partnership called LJM Cayman, L.P., to create special purpose entities (SPEs) to engage in a series of transactions known as Raptor I, Raptor II, Raptor III, and Raptor IV (known together as the Raptors), Cuiaba, Nigerian Barges, Coyote Springs II, and Global Galactic (SSI ¶¶ 29–43); (2) manipulating the value of assets such as Mariner Energy and the Elektro power plant (SSI ¶¶ 44 and 80); (3) circumventing accounting standards for the sale of assets in the Hawaii 125–0 transaction (SSI ¶¶ 45–46); (4) concealing the failures of Enron Energy Services (EES; SSI ¶¶ 47–48); (5) manufacturing earnings and concealing the failures of Enron Broadband Services (EBS) through manipulations known as Project Grayhawk, Project Braveheart, Backbone Trust, sale of "dark fiber," and a video-on-demand venture with Blockbuster (SSI ¶¶ 49–53); (6) manipulating reported earnings by reserving profits from energy trading on an internal ledger known as Schedule C (SSI ¶¶ 54–57); (7) circumventing accounting standards for valuing good will associated with Wessex Water Services (SSI ¶¶ 58–60), and (8) making false and misleading representations to the investing public, the SEC, rating agencies, and Enron employees based on these deceptive devices, transactions, and/or manipulations (SSI ¶¶ 61–85).

## C. Pending Motions

Asserting that the government's open-file policy requires them to review over 80 million pages of documents, defendants argue that the government has violated the discovery requirements of Rule 16 and *Brady* by burying them in paper, demanding a rushed trial date, and withholding obviously exculpatory materials.[2] Defendants seek "both a general order making clear that the Task Force's discovery practices to date have been deficient, and a specific order requiring the production of several categories of Rule 16 and *Brady* material."[3]

The government responds that it

---

**2.** See Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, pp. 9–10.

**3.** *Id.* at p. 3.

has produced the equivalent of "open file" discovery, affording defendants access to practically all materials in the government's possession. In light of the number of documents in this case, as well as the government's desire for a reasonable trial date, the government has also taken additional steps beyond the mandates of Rule 16 and *Brady*, including: producing and supplementing a set of hot documents; providing indices of numerous document productions; affording defendants access to the government's electronic database; and agreeing to identify for defendants any exculpatory information within the meaning of *Brady* that it locates.[4]

The government asserts that it has provided defendants

> a rolling production of hot documents since the time of indictment. These hot documents—culled from the larger discovery materials—represent a rough cut of what the government believes is the central evidence for both the government and the defense.[5]

The government argues that its production of hot documents is responsive to defendants' requests for material subject to both Rule 16 and *Brady*, and that defendants' assertion that its open-file policy requires defendants to review over 80 million pages of documents is contradicted by the transcript from the August 11, 2004, status conference where defense counsel told the court that

> out of what we estimate to be somewhere between 50 and 80 million documents that are [included] ... in the 1B Index we've honed ... down [the documents that we intend to review] to about 5 to 7 million, key Arthur Andersen documents, key Vinson & Elkins documents[, and] ... key Enron documents [that] were turned over to the government, about 500 boxes.[6]

Asserting that neither the government's open-file policy nor its production of hot documents satisfies its discovery duties, defendants seek an order directing the government to identify all state and federal agencies, investigators, or other entities or persons with which the Enron Task Force (ETF) has had, or currently has, a cooperating, investigatory relationship;[7] direct an ETF attorney to conduct a thorough review of all materials listed in the 1B Index, all witness statements, and all documentary and testimonial evidence in the files of agents, attorneys, and other personnel who have assisted in investigating and prosecuting this case in search of Rule 16 and *Brady* material;[8] produce a detailed description of the review conducted to date that states who has reviewed each category of materials, whether each category was reviewed on a page-by-page

4. Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, pp. 10–11.

5. *Id.* at p. 12. See also *id.* at n. 6 (stating that the hot documents include highly relevant material, e.g., exhibits presented to the grand jury, numerous documents relating to the details of transactions identified in the indictment, drafts of Power–Point presentations for analyst conferences, internal budget documentation including performance and commercial summaries and projections, and e-mail from defendants and prospective witnesses discussing key issues).

6. *Id.* at p. 21 (citing transcript of August 11, 2004, status conference, Exhibit *I* attached to Docket Entry No. 164, p. 23).

7. See Proposed Order attached to Docket Entry No. 176, ¶ 1.

8. See Proposed Order attached to Docket Entry No. 164, ¶ 1.

basis or by electronic word search and, if by word search, to state who formulated the word search and what level of secondary review the materials were accorded;[9] and disclose immediately all evidence favorable to the defense.[10] Skilling seeks, in addition, disclosure of six categories of information pursuant to Rule 16, *Brady*, and Jencks;[11] Causey adopts the factual and legal arguments set forth in Skilling's motion and seeks, in addition, disclosure of four categories of information.[12] Lay adopts the arguments advanced by Skilling and Causey, and seeks, in addition, disclosure of at least eighteen categories of information.[13]

9. *Id.* at ¶ 2.

10. *Id.* at ¶ 3.

11. See Jeffrey Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, pp. 19–23 (seeking disclosure of all (1) evidence that certain transactions were approved by others, (2) evidence that certain transactions complied with relevant rules or industry practice, (3) evidence that certain statements were true or that Skilling believed them to be true, (4) evidence that others withheld information from Skilling or that Skilling did not authorize or approve alleged unlawful activity, (5) evidence that certain actions were taken for reasons other than the criminal objectives alleged in the indictment, and (6) evidence tending to impeach any government witness).

12. See Richard A. Causey's Motion for the Identification and Production of *Brady* Materials, Docket Entry No. 181, p. 1 (stating that "Mr. Causey agrees with and adopts the factual and legal arguments set forth in Mr. Skilling's motion," and explaining that he "writes separately ... to identify and discuss particular categories of *Brady* material requested"). See also Memorandum in Support of Motion for the Identification and Production of *Brady* Materials, Docket Entry No. 182, pp. 5–10 (seeking disclosure of all (1) evidence that certain transactions were disclosed to and approved by others, (2) evidence that certain transactions complied with relevant industry rules or practice, (3) evidence that certain transactions were conducted for reasons other than those alleged in the indictment, and (4) impeachment evidence).

13. See Motion for Production of Material Favorable to the Accused, Docket Entry No. 237, p. 3 (adopting arguments advanced by Skilling and Causey), and pp. 15–23 (seeking disclosure of all (1) evidence related to allegation that he knew $7 billion of losses were embedded in Enron business units, (2) evidence related to allegation regarding mischaracterization of the $1.2 billion equity reduction as resulting from the unwind of the Raptors, (3) evidence related to allegations regarding misstatements that the $1.01 billion earnings charge was "non-recurring," (4) evidence related to allegations that he misrepresented Enron's liquidity, (5) evidence related to allegations about fees, (6) evidence related to allegations relating to bank fraud, (7) evidence relating to international assets, (8) evidence related to allegations concerning representations to rating agencies and financial analysts, and (9) evidence related to allegations concerning representations to employees, (10) any allegations against him found in the indictment are not true, (11) he did not act with the requisite intent or knowledge required by the statutes under which he is charged in the indictment, (12) he acted in reliance on the advice of accountants with respect to any matter alleged in the indictment, (13) he acted in reliance on the advice of counsel with respect to any aspect of any matter alleged in the indictment, (14) establish knowledge, acquiescence, or awareness of any officer, employee, or agent of the government, including but not limited to the SEC, regarding any of the transactions or events referred to in the indictment or that the government intends to introduce at trial, prior to the government's initiation of this investigation, (15) may be used to impeach any potential witness for the government, (16) that relates to the government's disclosure of grand jury material without obtaining a prior court order, including but not limited to disclosure to the media and/or representatives of the FBI or any other law enforcement agency, (17) documents witness interviews conducted in the course of this investigation that contain exculpatory material, including all FBI 302(s), handwritten notes, or other information, and (18) is exculpatory, would tend to impeach a witness, or is relevant to issues of punishment or sentencing).

## II. *Federal Rule of Criminal Procedure 16*

■ Rule 16 requires the government, upon request, to disclose certain types of information to defendants in criminal cases, e.g., "Defendant's Oral Statement," "Defendant's Written or Recorded Statement," "Defendant's Prior [Criminal] Record," "Documents and Objects," "Reports of Examinations and Tests," and "Expert Witnesses." Fed.R.Crim.P. 16(a)(1)(A)-(B), (D)-(G).[14] Rule 16 also provides that [e]xcept as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500. Fed.R.Crim.P. 16(a)(2) "Information Not Subject to Disclosure." If the defendant requests disclosures under Rule 16(a)(1)(E) or (F), and the government complies, the defendant must provide reciprocal disclosures upon request by the government. Fed.R.Crim.P. 16(b)(1)(A)-(B). Upon request from the government, the defendant must make expert witness disclosures. Fed.R.Crim.P. 16(b)(1)(C). Rule 16(c) imposes a continuing duty to disclose, and Rule 16(d) allows the court to regulate discovery. Fed.R.Crim.P. 16(c)-(d).

Defendants argue that the government's open-file policy and enumeration of hot documents fails to satisfy Rule 16 because the government has not identified which, if any, of the hot documents are material to their defense or which, if any, of the hot documents the government intends to use in its case-in-chief.[15] Citing *United States v. Pascual*, 606 F.2d 561, 565 (5th Cir. 1979), defendants argue that compliance with Rule 16 "requires more than a perfunctory invitation to look at the contents of a file." [16] Implicit in the defendants' argument is the assertion that the government must correctly label each document it produces in discovery, specifying whether it is one that the government believes is material to the defense, or one that the government intends to use in its case-in-chief.[17]

Rule 16(a)(1)(E) describes three categories of documents the government must turn over to the defendant during discovery: items that are "material to preparing the defense," items that "the government intends to use ... in its case-in-chief at trial," and items "obtained from or belong[ing] to the defendant[s]." Fed.R.Crim.P. 16(a)(1)(E)(i)-(iii).

The plain language of Rule 16 does not require the government to specify from

14. Subsection (a)(1)(C) is inapplicable to the present case because it deals with an "Organizational Defendant."

15. See Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, p. 12. Although the government asserts that Lay has expressly avoided a request for Rule 16 materials relating to its case-in-chief, presumably "to avoid reciprocal discovery obligations," see Government's Memorandum of Law in Response to Defendant Lay's Motion for Production of Ma-

terial Favorable to the Accused, Docket Entry No. 263, p. 10, Lay has expressly adopted the arguments advanced by Skilling and Causey. See Motion for Production of Material Favorable to the Accused, Docket Entry No. 237, p. 3.

16. *Id.* at p. 7.

17. *Id.* at p. 12 (faulting the government for "see[ing] no need to tell [defendants] which items made available ... in discovery correspond to which parts of Rule 16").

among the universe of discovery documents produced to defendants which documents it considers material to the defense or which documents it intends to use in its case-in-chief. Moreover, defendants have cited no case in which the government has been ordered to do so.

The government has voluntarily identified hot documents that it states "represent a rough cut of what the government believes is the central evidence for both the government and the defense," [18] and also states that "[w]ith respect to Rule 16 ... the government intends to provide defendants in advance of trial with an exhibit list, which the government expects will significantly overlap with the hot document production." [19] Although defendants argue that they cannot reasonably be expected to review the government's entire file of over 80 million document pages, they do not argue that they cannot reasonably be expected to review 300,000 pages of hot documents identified by the government.[20] Since the government has not merely offered defendants "a perfunctory invitation to look at the contents of a file," *Pascual*, 606 F.2d at 565, but has, instead, produced an assemblage of hot documents that it has identified as "central ... to both the government and the defense," [21] and has also agreed to produce its exhibit list to the defendants in advance of trial,[22] the court concludes that defendants' motions for Rule 16 discovery should be denied.

## III. *Brady v. State of Maryland and its Progeny*

In *Brady* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 1196–1197. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court expanded the prosecutor's duty to disclose favorable evidence to include evidence that would impeach a government witness. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3385, 87 L.Ed.2d 481 (1985), the Court held that evidence is "material" for *Brady* purposes if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995), the Court explained that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." The *Kyles* Court explained that courts addressing the question of materiality are not to ask "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 1566.

---

18. Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, p. 2.

19. *Id.* at p. 13.

20. See Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials,

Docket Entry No. 164, p. 12 (stating that the hot documents consist of roughly 300,000 pages).

21. Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, p. 2.

22. *Id.* at p. 13.

Defendants argue that they are entitled to disclosure of evidence favorable to their defense pursuant to the Supreme Court's decision in *Brady* and its progeny. However, *Brady* and its progeny "arise not in the context of pretrial criminal discovery but in post-judgment collateral review of criminal convictions." *United States v. Garrett*, 238 F.3d 293, 302 (5th Cir.2000) (Fish, J. concurring), *cert. denied*, 533 U.S. 917, 121 S.Ct. 2523, 150 L.Ed.2d 695 (2001) and 533 U.S. 938, 121 S.Ct. 2570, 150 L.Ed.2d 734. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) ("The rule of *Brady v. Maryland* . . . arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense."); *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."); *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir.2004) (resolution of a *Brady* claim requires the court to judge the effect of the evidence on the jury's verdict).

Since *Brady* and its progeny neither establish nor govern a rule of discovery but, instead, a self-executing constitutional rule that due process requires the prosecutor to disclose evidence favorable to the accused that is material to guilt or punishment, the court concludes that defendants' motions for production of *Brady* material should be denied. *See Bagley*, 105 S.Ct. at 3380 n. 7 ("[a]n interpretation of *Brady* to create a broad, constitutionally required right of discovery would entirely alter the character and balance of our present systems of criminal justice"). *See also United States v. Scott*, 524 F.2d 465, 467 (5th Cir.1975) (*Brady* "is not a pretrial remedy"); *United States v. Frick*, 490 F.2d 666, 671 n. 12 (5th Cir.1973), *cert. denied sub nom, Petersen v. United States*, 419 U.S.

831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974) (*Brady* is not "applicable at pre-trial stages"); *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation."); *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir.1994) ("*Brady* claims involve the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.").

## A. Elements of a *Brady* Claim

The Fifth Circuit has stated that

[t]o establish a *Brady* violation, a defendant must make three showings: [1] "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued."

*Sipe*, 388 F.3d at 477 (quoting *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999)). The final prong of this test involves determining whether the concealed evidence is material. *Id.* at 478. When there are multiple *Brady* violations the court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result. *Id.* (citing *Kyles*, 115 S.Ct. at 1560, and *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir.), *cert. denied*, 526 U.S. 1105, 119 S.Ct. 1590, 143 L.Ed.2d 683 (1999)). The government "bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence." *Id.* (citing *Rector v. Johnson*, 120 F.3d 551, 558–559 (5th Cir.1997), *cert. denied*, 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998)).

*1. Identification of Evidence Favorable to the Defense*

Defendants move the court for an order directing the government to have an ETF attorney review all materials to which it has access, to provide a detailed description of the materials subject to review, to identify who has reviewed or will review them, and to explain how the review has been calculated to produce evidence that would either favor the defense or impeach a government witness.[23] Citing *United States v. Antone*, 603 F.2d 566, 569 (5th Cir.1979), defendants argue that the government's "discovery obligations extend to the files of any entity or individual that cooperates in this investigation or prosecution."[24] Defendants specifically argue that the government's discovery obligations should extend to the Securities Exchange Commission (SEC), the Department of Labor (DOL), the Commodity Futures Trading Commission (CFTC), the Federal Energy Regulatory Commission (FERC), the National Association of Securities Dealers (NASD), the Treasury Department, the Office of the United States Trustee, the Permanent Subcommittee on the Investigations of the Committee on Governmental Affairs, the two Enron Bankruptcy Examiners, and the professionals with whom they worked.[25]

The government responds that it has principally reviewed all documents in the FBI's Intel Plus system by conducting appropriate word searches concerning transactions and issues relevant and material to the indictment ... [and that w]ith respect to documents only available in hard copy form, agents and/or prosecutors have reviewed all entries on the 1B form available only in hard copy form. Aware of its ongoing obligations, the government continues to review both electronic and hard copy material on the FBI's 1B list and intends to identify for defendants any exculpatory information within the meaning of *Brady* that it locates.[26]

The government argues that the defendants' demands that the government account for the manner and type of review of the evidence that it conducted exceed the requirements of *Brady*.[27] The government also argues that its discovery obligations extend only "to members of the prosecution team, which consists of federal prosecutors and agents of the Federal Bureau of Investigation ("the FBI") and the Internal Revenue Service ("the IRS")."[28]

(a) Duty to Identify Favorable Evidence

In *Kyles* the Supreme Court emphasized that the prosecutor is duty bound to be-

**23.** See Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, p. 14, and Proposed Order attached thereto.

**24.** Jeffrey Skilling's Motion for the Identification and Production of *Brady*, Rule 16, and Jencks Act Materials in the Possession of Cooperating State and Federal Agencies, the Enron Bankruptcy Examiners, and Other Cooperating Investigators, Docket Entry No. 176, p. 1.

**25.** See Proposed Order attached to Docket Entry No. 176, ¶ 3.

**26.** Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, p. 11.

**27.** *Id.*

**28.** Government's Memorandum of Law in Response to Defendant Jeffrey K. Skilling's Motion for the Identification and Production of *Brady*, Rule 16, and Jencks Act Material in the Possession of Cooperating State and Federal Agencies, the Enron Bankruptcy Examiners, and Other Cooperating Investigators, Docket Entry No. 194, p. 2.

come informed about available information and to evaluate the cumulative effect of all the evidence withheld from the defendants:

> While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" [i.e., that disclosure of the evidence would produce a different outcome] is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady,* 83 S.Ct. at 1196–1197), the prosecutor's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

> .  .  .  .  .

> [E]ven if due process were thought to be violated by every failure to disclose an item of exculpatory or impeachment evidence . . . the prosecutor would still be forced to make judgment calls about what would count as favorable evidence, owing to the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record. Since the prosecutor would have to exercise some judgment even if the State were subject to this most stringent disclosure

> obligation, it is hard to find merit in the State's complaint over the responsibility for judgment under the existing system, which does not tax the prosecutor with error for any failure to disclose, absent a further showing of materiality.

> .  .  .  .  .

> This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. See *Agurs,* 96 S.Ct. at 2399–2400 ("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure.").

*Id.* at 115 S.Ct. 1567–1568 (some citations omitted).

"These passages clearly place responsibility on the prosecutor, rather than the trial judge [or the defendants], to determine not only whether a given piece of evidence should be produced but also when [it should be produced] (i.e., when the point of 'reasonable probability' [of a different outcome] is reached)." *Garrett,* 238 F.3d at 304 n. 4 (Fish, J., concurring). Recognizing that prosecutors have an "independent duty to identify and disclose *Brady* material," the Fifth Circuit has expressly stated that "the identification of *Brady* material is preliminarily a matter for the prosecutor's judgment." *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 827 (1987).

(b) Scope of Duty to Identify

In *Kyles,* 115 S.Ct. at 1567, the Court emphasized that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." In this circuit prosecutors have long been charged with an obligation "to produce certain evidence actually or constructively in [their] possession or accessible to [them] in the interests of inher-

ent fairness." *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980) (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975), *cert. denied sub nom Calley v. Hoffmann*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976)).

> The need referred to in *Calley* is premised on the fact that the prosecutor has ready access to a veritable storehouse of relevant facts and, within the ambit of constitutional, statutory and jurisprudential directives, this access must be shared in the interests of inherent fairness ... to promote the fair administration of justice.

*Id.* The Fifth Circuit has declined "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." *Id.* (quoting *Antone*, 603 F.2d at 569).

The government argues that the prosecution team in this case consists solely of Department of Justice (DOJ) prosecutors assigned to the ETF, and agents from the FBI and the IRS. In contrast, defendants cite numerous examples of statements made on behalf of the government in press releases, at press conferences, and in reports asserting that the ETF has worked in close cooperation with the SEC to investigate and prosecute this and other Enron-related cases.[29] The government also ac-

knowledges that the SEC has provided evidence from its own investigation for use in this case, and that, at the government's request, the SEC has opened its files to the defendants for discovery in this case.[30] The court is therefore persuaded that the SEC has acted on the government's behalf in this case.

As explained by the Supreme Court in *Kyles*, 115 S.Ct. at 1567, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," or in this case, the SEC. Because defendants have failed to present any evidence demonstrating that any of the other entities named in its motion have acted on the government's behalf in this case, the court is not persuaded that the individual prosecutors working on this case have a duty to learn of favorable evidence known to those other entities (i.e., DOL, CFTC, FERC, NASD, the Treasury Department, the United States Trustee, the Permanent Subcommittee on the Investigations of the Committee on Governmental Affairs, the two Enron Bankruptcy Examiners, and the professionals with whom they worked).[31] However, since the government has stated that the SEC's files are open to the defendants, the court is not persuaded that an order directing the prosecutors in this case to inform themselves of evidence held by

---

**29.** See Jeffrey Skilling's Motion for the Identification and Production of *Brady*, Rule 16, and Jencks Act Materials in the Possession of Cooperating State and Federal Agencies, the Enron Bankruptcy Examiners, and Other Cooperating Investigators, Docket Entry No. 176, pp. 3–6, esp. p. 5 asserting that the hot documents include documents obtained by the government from the SEC.

**30.** See Government's Memorandum of Law in Response to Defendant Jeffrey K. Skilling's Motion for the Identification and Production of *Brady*, Rule 16, and Jencks Act Material in the Possession of Cooperating State and Fed-

eral Agencies, the Enron Bankruptcy Examiners, and Other Cooperating Investigators, Docket Entry No. 194, p. 4 n. 8, stating that "the SEC has produced transcripts to the government voluntarily. The transcripts were of testimony taken during the SEC's nonpublic investigation;" p. 5 stating that "the SEC has assisted the prosecution team;" p. 6 stating that "the government has been able to use its good offices to persuade the SEC to make discovery materials available to the defense."

**31.** See Proposed Order attached to Docket Entry No. 176, ¶ 3.

the SEC that may be favorable to the defense is needed at this time.

### (c) Conclusions

Because the identification of *Brady* material is preliminarily a matter for the prosecutor's judgment, and because the government files opened to the defendant in this case include files maintained by the SEC, the court concludes that the defendants' request for an order directing the government to have an ETF attorney review all materials to which it has access, to provide a detailed description of the materials subject to review, to identify who has reviewed or will review them, and to explain how the review has been calculated to produce evidence that would either favor the defense or impeach a government witness should be denied.

### 2. *Suppression of Evidence Favorable to the Defense*

■ Asserting that the government has produced no evidence in response to their general requests for *Brady* material,[32] defendants imply that the government must be suppressing evidence that it is constitutionally required to disclose. The government responds that "through an open file discovery practice, . . . [it] has produced practically all materials in . . . [the government's] possession, and therefore there

can be no claim of suppression." [33] While the government states that it "has not produced any document that it believes would alter the outcome of any trial, the [government asserts that the] hot documents the government has produced most certainly contain documents that are helpful to the defense and which defendants could argue are exculpatory." [34] Moreover, at a status conference held on August 11, 2004, the government stated that

> [w]e recognize *Brady* as our obligation. And we are reviewing the documents, and will continue to review the documents for any *Brady*. And if we find it, we will point it out. We're not going to, you know, rely on them to somehow find it.[35]

The government also states that "as to potentially exculpatory witnesses, [it] intends to provide the defendant[s] with a list of witnesses . . . who may possess arguably exculpatory information." [36] The government also states that it "intends to provide a written summary of the reasons it is identifying the witnesses for the defense." [37]

### (a) Government's Open–File Policy

In *Strickler*, 119 S.Ct. at 1949 n. 23, the Supreme Court expressly noted that "if a prosecutor asserts that he complies with

---

**32.** See Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, pp. 1–2.

**33.** Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, p. 5.

**34.** *Id.* at p. 13. Examples of such documents include a January 19, 2001, Arthur Andersen memo to the files approving Enron's decision to reserve $369 million in energy trading profits at the end of 2000 for volatile conditions in the Western United States; a May 2,

2001, e-mail from David Delainey, CEO of EES, indicating that EES's explosive growth justified consolidating the risk functions between EES and EBS; and a November 19, 1999, e-mail from Larry Derrett to John Echols that described Causey as having put his foot down on deals that were not supported by a true sale opinion of counsel. *Id.* at 13–16.

**35.** *Id.* at p. 19 (citing Transcript of August 11, 2004, conference, Skilling Exhibit I).

**36.** *Id.*

**37.** *Id.* at p. 20.

*Brady* through an open-file policy, defense counsel may reasonably rely on that file to contain all materials the ... [government] is constitutionally obligated to disclose under *Brady*." Moreover, the Fifth Circuit has stated that "there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over." *United States v. Mmahat,* 106 F.3d 89, 94 (5th Cir.), *cert. denied,* 522 U.S. 848, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997), *abrogated on other grounds by United States v. Estate of Parsons,* 367 F.3d 409, 415 (5th Cir.2004) (en banc). *Accord United States v. Mulderig,* 120 F.3d 534, 541 (5th Cir. 1997), *cert. denied,* 523 U.S. 1071, 118 S.Ct. 1510, 140 L.Ed.2d 664 (1998). *See also Sipe,* 388 F.3d at 478.

Defendants argue that this case is distinguishable from cases like *Strickler* and *Mmahat* because the amount of evidence that the government has disclosed is so great that having to review it all will unfairly impair defendants' ability to prepare for trial. Defendants assert that

> [l]ooking only at the Task Force's 1B Index, this "open file" contains 2,195 different entries, which in turn consist of well over 1,500 boxes of documents, 1,500 CDs, and 74 computer hard drives, as well as the separate email accounts of over 500 Enron employees. We have tried, but it is virtually impossible to quantify with precision the total number of pages or documents in the 1B Index. However, to put the volume of this one "open file" in perspective, the Task Force identified some 80 million pages of materials on the 1B Index as relevant just to the EBS case. And of course, as the Task Force conceded at the recent

scheduling conference in this case, the 1B Index continues to grow, with no cutoff date in sight...

Assuming we spent 30 seconds reviewing each of these 80 million pages, and devoted a team of 100 attorneys working 12 hours a day solely to this effort, it would still take us 15 years to review every page.[38]

To establish a *Brady* violation the defendants must show that the information allegedly withheld from them was not available through due diligence. *United States v. Aubin,* 87 F.3d 141, 148–149 (5th Cir. 1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997); *United States v. Brown,* 628 F.2d 471, 473 (5th Cir.1980). In *Mmahat,* 106 F.3d at 94, the defendants argued that the government violated *Brady* by failing to point the defense to a pair of allegedly exculpatory bank board resolutions. As explained by the Fifth Circuit,

> [s]ome months before trial, the government gave the defense access to a 500,-000-page cache of documents relating to the case, the most important portions of which were indexed. The Mmahats' theory of the case was that they actually had the authority to make the Cypress Park and Nel Place loans, and they searched the cache for evidence in support of this. It was not until after the trial was over, however, that counsel for one of their codefendants found what they were looking for—a pair of board resolutions that ostensibly gave the Mmahats general authority to negotiate and approve loans on whatever terms they saw fit. The Mmahats claim that the government should have alerted

---

**38.** Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, pp. 9–10 (citing affidavit of Kimothy Taylor in Support of Defendants' Reply Memorandum in Support of Motion for Bill of Particulars ¶ 8, and transcript of status conference held August 11, 2004, at p. 14).

them specifically to these resolutions in response to their *Brady* requests.

At a subsequent post-trial motion hearing, the government conceded that it had been aware of these resolutions but argued that it had met its *Brady* obligation by disclosing them in the 500,-000–page cache. The district court eventually found that, although the resolutions were material and might have affected the jury's verdict had they been introduced at trial, the defendants' lack of due diligence foreclosed the possibility of relief. We agree.

The Mmahats do not dispute that they had both personal knowledge of the resolutions and access to them before trial. Due diligence in failing to locate exculpatory material is a necessary element of a successful *Brady* claim, *Aubin,* 87 F.3d at 148–49, and we cannot see how the Mmahats meet this standard. As the district court correctly noted, there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over.

*Mmahat,* 106 F.3d at 94.

Because the government has produced hot documents, has stated that it will provide defendants an exhibit list prior to trial, and will also provide defendants a list of witnesses possessing exculpatory evidence and a summary of the reasons why it is disclosing those witnesses, the court is not persuaded either that the government expects the defendants to review its entire file in search of *Brady* material or that the universe of materials that the government does expect defendants to review is unreasonably broad.

#### (b) Government's Hot Documents

Defendants state that the government has produced approximately 300,000 pages of hot documents.[39] Although defendants do not argue that the hot documents are too numerous for them to review in a reasonable time and manner, they argue that the hot documents fail to satisfy the government's *Brady* obligation because the hot documents are both over- and under-inclusive.

Assuming without deciding that the hot documents contain materials that are not favorable to the defense, for the reasons explained in its discussion of the government's open-file policy, the court concludes that the defendants' request for an order directing the government to identify specifically which hot documents constitute *Brady* material should be denied. *See Mmahat,* 106 F.3d 89, 94 ("there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over"); *Sipe,* 388 F.3d at 478 (government "bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence").

As evidence that the hot documents are under-inclusive, defendants assert that the government "has withheld obviously exculpatory materials."[40] The only evidence that defendants offer in support of this assertion is a single e-mail from former Enron attorney Jordan Mintz stating that Skilling would have shut down the LJM partnership had he known how much mon-

---

**39.** *Id.* at p. 12. See also Defendant Jeffrey Skilling's Reply Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 183, p. 1.

**40.** Memorandum in Support of Jeffrey Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, p. 7.

ey Enron's former Chief Financial Officer (CFO), Andrew Fastow, was making.[41] Defendants argue that the government's failure to identify the Jordan Mintz e-mail in response to their request for *Brady* material demonstrates that the government is suppressing evidence favorable to the defense in violation of its *Brady* obligation. Citing statements made by Skilling's counsel about the Jordan Mintz e-mail before Skilling was indicted, the government argues that this e-mail was neither withheld nor suppressed because Skilling's lawyers knew about it's existence before Skilling was indicted.[42]

Where the evidence in question is already known to the defense the evidence cannot be suppressed by the government, and the government's failure to disclose it does not violate *Brady.* *See Castillo v. Johnson,* 141 F.3d 218, 223 (5th Cir.), *cert. denied,* 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). *See also United States v. Runyan,* 290 F.3d 223, 246 (5th Cir.), *cert. denied,* 537 U.S. 888, 123 S.Ct. 137, 154 L.Ed.2d 149 (2002) ("[e]vidence is not 'suppressed' [under *Brady* ] if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it... The Government is not required ... to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own."); *United States v. Campagnuolo,* 592 F.2d 852, 861 (5th Cir.1979) ("[T]he government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.").

Absent any evidence that the government has suppressed or is suppressing exculpatory evidence about which the defendants have no knowledge, the court is persuaded that the government should be taken at its word that it is complying with its *Brady* obligations. The right to due process is not violated if the *Brady* material is disclosed in time for the defendant to use it effectively at trial. *See United States v. O'Keefe,* 128 F.3d 885, 898 (5th Cir.1997), *cert. denied,* 523 U.S. 1078, 118 S.Ct. 1525, 140 L.Ed.2d 676 (1998); *United States v. Ellender,* 947 F.2d 748, 757 (5th Cir.1991); *Campagnuolo,* 592 F.2d at 860–61. Defendants have failed to persuade the court either that the government is suppressing material evidence not known to them, or that a later disclosure of such evidence will preclude them from using it effectively at trial.

### 3. *Materiality*

█ In *Kyles* the Supreme Court emphasized the prosecutor's duty to become informed about available information and to evaluate the cumulative effect of all evidence withheld from the defendant. *Kyles,* 115 S.Ct. at 1555. In describing materiality, the Court explained that

[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

115 S.Ct. at 1566. Whether any particular matter is exculpatory must be determined within the context of the government's evi-

---

**41.** See SSI ¶¶ 12–13 identifying Fastow as Enron's former CFO, and as a conspirator of the defendants named in this case.

**42.** Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and

Rule 16 Materials, Docket Entry No. 175, pp. 9–10 (citing Skilling Exhibit K (September 15, 2004, letter from Government to Skilling's counsel quoting one of Skilling's lawyers in a *Business Week Online* article characterizing the e-mail as "the most exculpatory piece of evidence I have heard.")).

dence taken as a whole. *Id.* at 1560. *See also Sipe,* 388 F.3d at 479 ("*Brady* decision can never be divorced from the narrative of the trial ... [and] the court must consider not simply the withheld evidence in isolation, but also the quantity and quality of other evidence in the record").

Defendants have not demonstrated that the government is suppressing evidence favorable to the defense, no trial has occurred, and no trial date has been set in this case. Consequently, even assuming that the government were withholding evidence favorable to the defense, without the benefit of a trial record the court is unable to determine whether the defendants' right to due process has been, would, or even could be violated. *See United States v. Neal,* 27 F.3d 1035, 1050 (5th Cir.), *cert. denied,* 513 U.S. 1008, 115 S.Ct. 530, 130 L.Ed.2d 433 (1994) and 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1994) (finding no prejudice to the defendant when the government disclosed *Brady* information to the defendant during its case-in-chief); *O'Keefe,* 128 F.3d at 898 (government did not violate *Brady* when it turned over witness statements during trial pursuant to the requirements of the Jencks Act because right to due process is not violated if the *Brady* material is disclosed in time for the defendant to use it effectively at trial). *See also United States v. Kubiak,* 704 F.2d 1545, 1549–1550 (11th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983) (in determining whether nondisclosure of exculpatory information constituted a denial of due process, "the focus is not upon the fact of nondisclosure, but upon the impact of the nondisclosure on the jury's verdict"); *United States v. McVeigh,* 954 F.Supp. 1441, 1449–1450 (D.Colo.1997) ("[t]here is no established procedure for the due process disclosures required by *Brady* ... [because] it is not possible to apply the materiality standard ... before the outcome of the trial is known").

Recognizing this fact, defendants urge the court to apply the pretrial *Brady* standard developed in *United States v. Sudikoff,* 36 F.Supp.2d 1196, 1198–1201 (C.D.Cal.1999). After realizing that the definition of "materiality" recognized in *Brady* and its progeny can be applied only in a post-trial setting, the *Sudikoff* court concluded that in the pretrial setting, *Brady* requires disclosure of "evidence that may reasonably be considered favorable to the defendant's case and that would likely lead to admissible evidence." 36 F.Supp.2d at 1201. Because the *Brady* standard applied in *Sudikoff* conflicts with the *Brady* standard applied in this circuit, and because defendants fail to cite—and the court has not found—any case in which the Fifth Circuit has adopted or applied the *Sudikoff* standard, the court is not persuaded to apply that standard in this case. Accordingly, the court concludes that defendants' requests for an order directing the government to disclose *Brady* material should be denied. *See Beasley,* 576 F.2d at 630 ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation"); *Garrett,* 238 F.3d at 303–304 n. 12 (Fish, J., concurring) (same); *Scott,* 524 F.2d at 467 (same).

## B. Statements Subject to the Jencks Act

Defendants argue that the government should immediately produce all witness statements, interview transcripts, and grand jury testimony that contain *Brady* material so that defendants can make effective use of such statements.[43] Citing *United States v. Harris,* 458 F.2d 670, 676 (5th Cir.), *cert. denied,* 409 U.S. 888, 93

---

**43.** See Jeffrey Skilling's Memorandum in Support of Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 164, pp. 6 and 18.

S.Ct. 195, 34 L.Ed.2d 145 (1972), the government argues that the production of witnesses statements is governed by the Jencks Act, which does not require production of such material in advance of trial.[44] However, recognizing "the magnitude and complexity of the case, the government [states that it] intends to turn over this material earlier than is required under the law, specifically 30 days before trial." [45]

### 1. *Jencks Act*

In *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), the Supreme Court, relying on its supervisory power

> to prescribe procedures for the administration of justice in the federal courts ... decided that the defense in a federal criminal prosecution was entitled, under certain circumstances, to obtain, for impeachment purposes, statements which had been made to government agents by government witnesses. These statements were therefore to be turned over to the defense at the time of cross-examination if their contents related to the subject matter of the witness' direct testimony, and if a demand had been made for specific statements which had been written by the witness or, if orally made, as recorded by agents of the Government. We also held that the trial judge was not to examine the statements to determine if they contained material inconsistent with the testimony of the witness before deciding whether he would turn them over to the defense. Once the statements had been shown to contain related material only the defense was adequately equipped to decide

whether they had value for impeachment. This decision only concerned production and therefore did not purport to modify the laws of evidence governing the admissibility of prior statements of a witness.

*Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 1221, 3 L.Ed.2d 1287 (1959) (describing its decision in *Jencks* ). Soon after the Supreme Court decided *Jencks* Congress initiated and enacted the Jencks Act, which provides:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
>
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(a)-(b). In *Palermo* the Court explained that

> [o]ne of the most important motive forces behind the enactment of this leg-

**44.** Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, p. 23.

**45.** Government's Memorandum of Law in Response to Defendant Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials, Docket Entry No. 175, p. 23.

islation [i.e., the Jencks Act] was the fear that an expansive reading of *Jencks* would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness ... The purpose of the Act, its fair reading and its overwhelming legislative history compel us to hold that statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500, cannot be produced at all.

*Palermo,* 79 S.Ct. at 1223–1224.

### 2. Conflict with Brady

Defendants' argument that the government should disclose immediately statements that are arguably subject to both *Brady* and the Jencks Act arises from an apparent conflict between the Jencks Act's proscription of disclosure until after the witness has testified, and *Brady*'s requirement that evidence be disclosed at a time when it will be useful to the defense. *See O'Keefe,* 128 F.3d at 898 (right to due process is not violated if the *Brady* material is disclosed in time for the defendant to use it effectively at trial); *Ellender,* 947 F.2d at 757 (same); *Campagnuolo,* 592 F.2d at 860–861 (same). *See also United States v. Walters,* 351 F.3d 159, 169 (5th Cir.2003); *United States v. Fisher,* 106 F.3d 622, 634–635 (5th Cir.1997), *abrogated in part on other grounds by Ohler v. United States,* 529 U.S. 753, 120 S.Ct. 1851, 1853, 146 L.Ed.2d 826 (2000) (defense counsel must have access to *Brady* information "in time for it to make a meaningful difference in their trial strategy"). The apparent conflict between *Jencks* and *Brady* has led to a split among the circuit courts of appeal. *See United States v. Beckford,* 962 F.Supp. 780, 791–792 (E.D.Va.1997) (recognizing circuit split and opting to eschew the "bright line rules reflected in the circuit split," in favor of a "balancing analysis that takes into account the facts of each case").

### 3. Fifth Circuit Law

Although courts in other circuits have held that the constitutional dictates of *Brady* govern the disclosure of evidence that can reasonably be classified as both *Brady* and Jencks material, *see, e.g., United States v. Starusko,* 729 F.2d 256, 263 (3d Cir.1984), the law in this circuit is that when evidence is subject to both *Brady* and *Jencks,* the timing of its production is governed by the Jencks Act. *See Campagnuolo,* 592 F.2d at 858 (pretrial discovery order invalid to extent that it allowed discovery beyond the limitations of the Jencks Act); *Scott,* 524 F.2d at 467 ("This Court and others have recognized that the rule announced in *Brady* is not a pretrial remedy and was not intended to override the mandate of the Jencks Act."); *United States v. Martino,* 648 F.2d 367, 384 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 949, 102 S.Ct. 2006, 2007, 2020, 72 L.Ed.2d 465, 474 (1982) ("when alleged *Brady* material is contained in Jencks Act material, disclosure is generally timely if the government complies with the Jencks Act"); *United States v. Welch,* 810 F.2d 485, 489 & n. 2 (5th Cir.1987) (district courts in this circuit lack the power to order disclosure of Jencks Act material earlier than the statute provides); *O'Keefe,* 128 F.3d at 898 (government did not violate *Brady* when it turned over witness statements during trial pursuant to the requirements of the Jencks Act). Nevertheless, in order to facilitate the defense's preparation for cross-examination, the government routinely agrees to produce Jencks Act material either before trial or prior to direct examination. *See Campagnuolo,* 592 F.2d at 858 n. 3 (Jencks Act does not prohibit prosecutor from agreeing to disclose Jencks Act material before trial). In this case the government has stated that it

"will produce Jencks Act materials 30 days before trial." [46] Because the Jencks Act does not entitle defendants to receive statements given by other witnesses in advance of trial, and because the government has agreed to produce Jencks Act material 30 days before trial, the court concludes that defendants' motion for immediate disclosure of Jencks Act material should be denied.

## IV. Conclusions and Order

For the reasons explained above, the defendants have failed to persuade the court that the government is not complying with obligations imposed upon it by either Federal Rule of Criminal Procedure 16 or the Supreme Court's decision in *Brady v. State of Maryland*, 83 S.Ct. at 1194, and its progeny. Accordingly, Jeffrey Skilling's Motion for the Identification and Production of *Brady* and Rule 16 Materials (Docket Entry No. 164) is **DENIED**; Jeffrey Skilling's Motion for the Identification and Production of *Brady*, Rule 16, and Jencks Act Materials in the Possession of Cooperating State and Federal Agencies, the Enron Bankruptcy Examiners, and Other Cooperating Investigators (Docket Entry No. 176) is **DENIED**; Defendant Richard A. Causey's Motion for the Identification and Production of *Brady* Materials (Docket Entry No. 181) is **DENIED**; and Kenneth L. Lay's Motion for the Production of Material Favorable to the Accused (Docket Entry No. 237) is **DENIED**.

## V. Order for Scheduling Conference

Counsel shall appear for a scheduling conference on February 24, 2005, at 2:00 p.m., at the United States Courthouse, Court Room 9–B, 9th Floor, 515 Rusk Avenue, Houston, Texas 77002.

The government shall produce its Twenty-second Joint Status Report on February 17, 2005. The report shall state the ap-

proximate number of hot documents that have been produced for each transaction and manipulative device alleged in the SSI and identified on pages 3 and 4 of this Memorandum and Order. The government shall also state (1) how many hot documents remain to be disclosed, (2) when it expects to complete the disclosure of hot documents, (3) when it intends to disclose its list of witnesses possessing exculpatory evidence and its summary of the reasons for disclosing those witnesses, and (4) when it intends to produce its exhibit list.

Each counsel will also state his availability to begin trial during the months of June through September of 2005.

When the parties submit the Twenty-second Joint Status Report the government shall also produce for the court's *in camera* review an explanation of (1) why it seeks to produce certain Jencks material closer than thirty days before trial, and during the trial itself, and (2) the amount of such material.

---

**46.** Government's Memorandum of Law in Response to Defendant Lay's Motion for the Production of Material Favorable to the Accused, Docket Entry No. 263, p. 9.